IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOANIE ALSTON,<br><br>    Plaintiff,<br><br>v.<br><br>PARK PLEASANT, INC.,<br><br>    Defendant. | CIVIL ACTION<br>NO. 14-07237 |

PAPPERT, J.                                               OCTOBER 21, 2015

## MEMORANDUM

Defendant Park Pleasant, Inc. ("Park Pleasant") fired Plaintiff Joanie Alston ("Alston") on August 1, 2012. Believing she was terminated because of a disability, Alston sued Park Pleasant for violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§ 951-963.

Park Pleasant moves for summary judgment. The Court heard oral argument on the motion and has carefully evaluated the entire record. The undisputed material facts show that there is insufficient evidence by which a factfinder could conclude that Alston has established a *prima facie* case of disability discrimination. Even if Alston could establish her *prima facie* case, there is sufficient evidence showing that Park Pleasant had a legitimate nondiscriminatory reason for firing Alston, namely her poor performance as the Director of Nursing. Inasmuch as Alston cannot make out a *prima facie* case, she is similarly unable to establish that Park Pleasant's reason for her firing was pretextual. Park Pleasant is accordingly entitled to judgment as a matter of law, and the Court grants its motion.[1]

---

[1] The Court also held oral argument on Alston's Motion for Spoliation Sanctions (ECF No. 23.), which alleged that Park Pleasant "intentionally destroyed electronic and paper data critical to [Alston's] claims." (Pl.'s Motion for Spoliation Sanctions, ECF No. 23, at pg. 10.) While the Court's decision to grant summary judgment

1

**I.**

Park Pleasant was a long term care facility that operated in Philadelphia. (Alston Dep. 84:21-23.) Park Pleasant hired Alston as its Director of Nursing on August 29, 2011. (*Id.* at 88:8-10.) When Alston began working, her supervisor was Nancy Kleinberg ("Kleinberg"). (*Id.* at 89:6-9; Kane Dep. 49:12-14.) At the time, Kleinberg was acting as both the Administrator and Assistant Administrator at Park Pleasant. (Alston Dep. 36:10-37:9.) In February of 2012, Kleinberg became CEO and relinquished her role as Administrator to Carmella Kane ("Kane"). (*Id.* at 37:10-38:1; Kane Dep. 48:24-49:6.) At that point, Kane became Alston's supervisor. (*Id.*; Kane Dep. 49:12-19.)

Alston was performing her job up to Park Pleasant's expectations from August of 2011 to February of 2012. (Kane Dep. 32:11-23.) However, her attitude began to change when Kane took over as her supervisor. (*Id.*) According to Kane, Alston failed to perform her job duties, did not develop policies and procedures, and was adversarial toward Kane. (*Id.* at 13:19-14:4; 15:12-17; 37:18-38:14.) On April 14, Kane asked Alston to complete a shift change policy for the staff. (Kleinberg Dep. 92:4-20.) After receiving no response, Kane emailed Alston a month later saying "we really have to come up with a shift change procedure. Let's brain storm tomorrow." (ECF No. 16-3, Exhibit F.) Alston responded by saying, "I will handle." (*Id.*) Alston failed to create a shift change policy. (Kleinberg Dep. 92:4-20.)

---

renders the spoliation motion moot, the motion would nevertheless be denied. Spoliation occurs "when (a) the evidence was in the party's control, (b) the evidence is relevant to the claims or defenses in the case, (c) there has been actual suppression or withholding of evidence, and (d) the duty to preserve the evidence was reasonably foreseeable to the party." *First Sr. Fin. Grp. LLC v. Watchdog*, No. 12-CV-1247, 2014 WL 1327584, at *4 (E.D. Pa. Apr. 3, 2014). Alston fails to establish that there has been actual suppression or withholding of evidence. Indeed, Park Pleasant offered to help Alston access the information, to the extent it even existed or was accessible, Alston was seeking. (Oral Argument Transcript ("Oral Arg. Trans."), ECF No. 38, at 46:6-22.) Alston refused to acknowledge or even respond to Park Pleasant's offer. Alston cannot now claim that such evidence, if it even existed, was actually suppressed or withheld.

Additionally, throughout her employment Alston was told to admit patients at any time, so long as they could safely get into the facility. (Kane Dep. 30:18-31:2.) On June 7, Alston objected to admitting a new patient because she felt that it could wait until the following morning. (*Id*. at 30:3-31:16; 33:19-34:6; Alston Dep. 169:6-12.) Alston refused to help with the admission of the patient. (Kane Dep. 33:19-34:6.) At some point in early June, Alston told Kane she was not happy in her role as Director of Nursing. (Alston Dep. 223:20-23.) On June 14, Kane sent an email to Alston noting that Alston's "concerns are of great importance to us as our partnership cannot work and continue unless our issues are resolved." (ECF No. 16-3, Exhibit K.) Kane noted that although Alston failed to attend a required meeting because she was "too emotional," Park Pleasant was willing to reschedule the meeting. (*Id*.) Kane ended the email by saying that the rescheduled meeting was "the third attempt to meet to ensure that we can resolve these issues and decide if we can move forward." (*Id*.)

Kane tried to counsel Alston and help explain what was expected of her. (Kane Dep. 37:9-17.) However, Alston said that she didn't have to obey Kane. (*Id*. at 14:4-12; Kleinberg Dep. 120:11-15.) On one occasion, Alston responded to a request from Kane by saying "last time I looked, this was a free country and there's no slavery in America anymore." (*Id*.) On June 21, a meeting was held between Alston, Kleinberg, Kane, and Human Resources Director Sonjii West ("West"). (ECF No. 16-3, Exhibit L.) During that meeting, Alston was given examples of her unprofessional behavior, and told that she had not performed her job responsibilities. (*Id*.; Kleinberg Dep. 108:18-111:22.) At that time Alston was also informed that if she was going to continue working, there would be a Plan of Action ("the Plan") implemented. (Alston Dep. 373:8-20; Kleinberg Dep. 100:4-12.) The Plan was going to identify problems with

Alston's work, set goals for improvement, and provide Alston with steps to achieve those goals. (Kleinberg Dep. 100:17-19.)

On June 26, Alston took off from work in order to have a breast biopsy the following day. (Alston Dep. 26:1-8; 189:3-17; 231:14-20.) The day after her biopsy, Alston sent an email to a number of employees letting them know that she had surgery and was doing okay. (*Id*. at 323:15-328:11; ECF No. 16-3, Exhibit M.) Neither Kleinberg, Kane nor West received the email. (*Id*.) Alston had a second biopsy on July 1. (Alston Dep. 26:9-13; 193:5-10.) She returned to work on July 10. (*Id*. at 189:8-12.)

On July 12, Alston was diagnosed with Ductal Carcinoma in Situ ("DCIS")[2]. (*Id*. at 26:17-27:6.) Alston told neither Kane nor Kleinberg that she had been diagnosed with DCIS. (Kane Dep. 67:17-22; Kleinberg Dep. 147:1-148:11.) Alston stated that she had conversations with Kane, Kleinberg and West about her biopsies, but couldn't recall any conversations with them about her medical diagnosis specifically. (Alston Dep. 191:6-200:10.) Kane testified that no one ever told her the results of Alston's biopsies. (Kane Dep. 67:17-68:7.) Additionally, Kleinberg didn't know Alston had been diagnosed with DCIS until her deposition. (ECF No. 16-3, Exhibit Q.) After she was diagnosed, Alston was not limited in her ability to care for herself, drive or maintain her household. (Alston Dep. 178:12-24.) Indeed, when she returned to work Alston told Kleinberg and Kane that she was able to perform her job duties. (*Id*. at 234:7-19.)

Also on July 12, Alston began having weekly meetings with Kane and Assistant Administrator Lisa Reifenrath ("Reifenrath") to discuss what job duties Alston needed to complete. (*Id*. at 234:20-237:7.) Kane kept a record of which job duties were assigned during

---

[2] DCIS is the presence of abnormal cells inside a milk duct in the breast. DCIS is considered the earliest form of breast cancer. DCIS is noninvasive, meaning it hasn't spread out of the milk duct to invade other parts of the breast. Mayo Clinic Staff, *Ductal Carcinoma in Situ*, http://www.mayoclinic.org/diseases-conditions/dcis/basics/definition/con-20031842 (last visited October 19th, 2015).

4

those weekly meetings, and which job duties were actually completed.  (Kleinberg Dep. 99:14-24; Kane Dep. 57:6-12; ECF No. 16-3, Exhibit O.)  On July 26, Alston, Kleinberg, Kane, Reifenrath and West all met to discuss Alston's work performance.  (Alston Dep. 102:16-103:12.)  Kleinberg told Alston she wasn't performing her job.  (*Id*. at 104:14-105:4.)  Alston was presented with the Plan which identified expectations and areas needing immediate improvement.  (ECF No. 16-3, Exhibit P.)  The Plan stated that Alston had "not performed [her] job responsibilities per the expectations and standards of Park Pleasant," and that "[a]ny failure to reach or maintain these expectations will result in termination."  (*Id*.)

      The Plan required Alston to be more professional by, *inter alia*, not cursing at meetings and keeping her emotions under control.  (*Id*.)  Additionally, Alston was required to work cooperatively with her supervisors and not to disparage her supervisors to her subordinates.  (*Id*.)  The Plan called for Alston to be "a hands on Director of Nursing," and take responsibility for the development of policies and systems within her department.  (*Id*.)  Finally, Alston was required to communicate effectively with both her Administrators and subordinates, and follow directives and meeting timelines.  (*Id*.)  Alston signed the Plan that day.  (*Id*.)

      On July 31, Kane and Reifenrath met with Alston again.  (Alston Dep. 247:4-14.)  At that meeting Alston was asked what her priorities were for the nursing department, to which she responded that she "needed to know what was expected of the nursing department from her." (*Id*. at 394:19-395:5.)  Following that meeting, Kane and Reifenrath expressed their frustration to Kleinberg.  (Kleinberg Dep. 101:7-25.)  They indicated that things weren't getting better and that they didn't feel a good sense of cooperation.  (*Id*.)  At that point, after the lack of cooperation coming out of the ongoing meetings, Kleinberg felt they weren't going to be able to fix the situation.  (*Id*.)  That same day, Kleinberg, Kane and West agreed that Alston should be

terminated.  (Kane Dep. 24:20-25:5.)  On August 1, Kleinberg terminated Alston for not performing her job as expected.  (Kleinberg Dep. 32:17-21; Alston Dep. 239:18-22.)

## II.

Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law.  *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Emp. Health & Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002); *see also* Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  A mere scintilla of evidence in support of the non-moving party will not suffice; there must be evidence by which a jury could reasonably find for the non-moving party.  *Id.* at 252.

In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."  *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009).  The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment.  *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III.

The ADA makes it unlawful for an employer "to discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Under the PHRA, an employer may not discharge or otherwise discriminate on the basis of a non-job related handicap

or disability. 43 P.S. § 955(a). "The PHRA is basically the same as the ADA in relevant respects and 'Pennsylvania courts … generally interpret the PHRA in accord with its federal counterparts.'" *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)). Therefore, the Court's analysis of Alston's ADA claim applies to her PHRA claim as well.

Disability discrimination claims based on allegations of indirect discrimination are analyzed under the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Fakete v. Aetna, Inc.*, 308 F.3d 335, 338 (3d Cir. 2002) (differentiating the analysis in cases of "direct" vs. "indirect" discrimination); *see also Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751 (3d Cir. 2004). Alston must first establish a *prima facie* case of discrimination under the ADA by a preponderance of the evidence. *Williams*, 380 F.3d at 761. The plaintiff's burden at this stage of the analysis is "not meant to be onerous." *Cellucci v. RBS Citizens, N.A.*, 987 F. Supp. 2d 578, 589 (E.D. Pa. 2013). If Alston succeeds in establishing a *prima facie* case, the burden shifts to Park Pleasant "to articulate some legitimate, nondiscriminatory reason for the employee's [termination]." *McDonnell Douglas*, 411 U.S. at 802. "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). If the defendant meets its "relatively light burden" of articulating a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to "show by a preponderance of the evidence that the employer's explanation is pretextual." *Id.*

The Court must accordingly first determine whether Alston has presented evidence sufficient to establish a *prima facie* case of disability discrimination. "To establish a *prima facie*

case of discrimination under the ADA, a plaintiff must … show '(1) [she] is a disabled person within the meaning of the ADA; (2) [she] is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [she] has suffered an otherwise adverse employment decision as a result of discrimination.'" *Williams*, 380 F.3d at 761 (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999)).  The parties do not dispute that Alston was qualified to perform the essential functions of the job. However, the parties do dispute whether Alston was disabled, and whether she suffered an adverse employment decision as a result of discrimination.

A "disability" is defined by the ADA as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Williams*, 380 F.3d at 762 (citing 42 U.S.C. § 12102(2)).  Alston's complaint can only fairly be read to allege that her DCIS diagnosis constitutes a physical or mental impairment that substantially limits one or more of her major life activities.[3]  (Compl. at ¶ 6.)  EEOC regulations provide that an individual is "substantially limited" in a major life activity if they are "(i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which [they] can perform a particular major life activity as compared to the condition, manner, or duration under which the average

---

[3] At oral argument, Alston's counsel for the first time stated that Alston is "claiming that there was a perception on the part of [Park Pleasant]" that she was disabled. (Oral Arg. Trans. at 97:19-23.) However, Alston's complaint fails to allege that Park Pleasant regarded her as disabled. Indeed, there are only two allegations in Alston's complaint relating to her alleged disability. The first states that "[t]he termination decision occurred within weeks after Alston had been diagnosed with breast cancer and had taken leave to undergo a diagnostic medical procedure." (Complaint, ECF No. 1, at ¶ 6.) The second states that "[a]fter Park Pleasant became aware of Alston's serious health issues, the criticisms of her ratcheted up." (*Id*. at ¶ 16.) Additionally, Alston testified in her deposition that her disability was the reason she was terminated. (Alston Dep. 265:2-266:17.) Without specific factual allegations in her Complaint, Alston cannot for the first time contend–at summary judgment–that Park Pleasant regarded her as disabled.

8

person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1). An individual must do more than "merely submit evidence of a medical diagnosis of an impairment." *Davis v. Davis Auto, Inc.*, No. 10-CV-03105, 2011 WL 5902220, at *5 (E.D. Pa. Nov. 22, 2011) *aff'd*, 509 F. App'x 161 (3d Cir. 2013) (internal citations omitted). Indeed, "it is well-established that a particular diagnosis, no matter how severe (or severe-sounding to the layperson), standing alone, is not sufficient to establish 'disability.'" *Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 513 (3d Cir. 2001).

Alston fails to establish how her diagnosis of DCIS substantially limited any major life activity. Indeed, she acknowledged at her deposition that nothing about her diagnosis impacted her ability to work. (Alston Dep. 177:22-178:11.) She admitted that her diagnosis did not affect her ability to drive. (*Id*. at 178:11-24.) Additionally, she never had any issues taking care of herself. (*Id*.) She further stated that her diagnosis did not limit her ability to maintain her household. (*Id*.) Moreover, Alston's counsel at oral argument stated "[m]y client has not claimed that she had any limitations in her activities." (Oral Arg. Trans. at 97:16-21.)

Alston did testify that her medication limits her ability to engage in social activities "at times." (*Id*. at 179:1-8.) Even assuming that engaging in social activities could constitute a major life activity, the EEOC regulations state that "[a]n individual is not substantially limited in a major life activity if the limitation … does not amount to a significant restriction when compared with the abilities of the average person." 29 C.F.R. app. § 1630.2(j). By way of example, the regulations provide that "an individual who had once been able to walk at an extraordinary speed would not be substantially limited in the major life activity of walking if, as a result of a physical impairment, he or she were only able to walk at an average speed, or even at moderately below average speed." (*Id*.) Alston only stated that she was limited in engaging in

9

social activities "at times." This is insufficient to show that she was "substantially" limited in engaging in social activities. Outside of this one statement, Alston cannot point to any record evidence that her diagnosis has substantially limited major life activities, and thus fails to establish a disability under the ADA.

Even if Alston could establish that she was disabled, she still fails to show that she was terminated because of her diagnosis. "[T]o establish discrimination because of a disability, an employer must know of the disability." *Curran v. Se. Pennsylvania Transp. Auth.*, No. CIV.A. 13-5919, 2015 WL 1542290, at *6 (E.D. Pa. Apr. 7, 2015). Indeed, "an employer cannot fire someone because of a disability it knows nothing about." *Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996). Additionally, "[t]he knowledge of other employees should not be imputed to those responsible for making the decision at issue." *Curran*, WL 1542290, at *6 (citing *Olson v. Gen. Elec. Aerospace*, 101 F.3d 947, 954 (3d Cir.1996)).

Alston testified that she told other employees about her diagnosis of DCIS. (Alston Dep. 204:14-210:9.) However, none of the individuals Alston told were involved in the decision to terminate her. Indeed, the only three people involved in her termination decision were Kleinberg, Kane and West. While Alston did discuss her biopsies with all three individuals, there is no credible record evidence that she discussed her DCIS diagnosis with any of them. (Kleinberg Dep. 147:25-148:11; Kane Dep. 67:17-22; Alston Dep. 191:18-205:13.)

In response to Park Pleasant's motion, Alston submitted two signed declarations disputing, *inter alia*, that Kleinberg and Kane had no knowledge of Alston's diagnosis. The declarations also, however, contradict key parts of Alston's own deposition testimony on that very same topic. Specifically, Alston testified in her deposition that she had two conversations about her medical condition with Kleinberg. (Alston Dep. 190:13-17.) The first conversation


was about having a biopsy. (*Id*.) The second conversation was an update on how the surgery went. (*Id*. at 191:2-5.) She went on to say that she couldn't remember any other conversations she had with Kleinberg about her medical condition. (*Id*. at 194:16-20.)

Alston also testified that she remembered only one conversation with Kane where they discussed the upcoming surgery and the results of a pre-surgery MRI. (*Id*. at 195:19-197:14.) She did not remember any other conversations she had with Kane about her medical condition. (*Id*. at 197:18-22.) Finally, she testified that she had conversations with West about her biopsies and family history. (*Id*. at 198:13-202:6.) Other than these conversations, Alston couldn't recall any other conversations she had with West about her medical condition. (*Id*.)

Alston's declarations, however, attempt to tell a different story. Alston states that "[a]fter [her] medical issues arose, [she] had regular and ongoing discussions with Nancy Kleinberg and Carmella Kane." (Plaintiff's Declaration ("Pl.'s Decl."), ECF No. 19, at ¶ 11.) Additionally, Alston stated "with 100% certainty that Ms. Kane and Ms. Kleinberg were fully aware of [her] medical condition, the course of [her] medical condition and medical status, as [she] shared this information with them." (*Id*. at ¶ 18.)

It appears as if Alston's declarations are "sham affidavits," submitted in an effort to create genuine disputes of material fact. "A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment. A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant." *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). Absent any credible record evidence that either Kleinberg, Kane or West knew of Alston's diagnosis, Alston cannot establish that she was terminated

because of her DCIS.  Alston thus fails to make out a *prima facie* case of disability discrimination.

However, even if Alston could satisfy her *prima facie* burden, Park Pleasant has proffered a legitimate non-discriminatory reason for Alston's termination.  Under the *McDonnell Douglas* burden shifting framework, "if the plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment decision." *Fuentes*, 32 F.3d at 763.  This burden is satisfied if the employer produces evidence "which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Id*. (citation omitted).  If the employer meets this "relatively light" burden, the plaintiff must then prove by a preponderance of the evidence that the legitimate, nondiscriminatory reason offered by the defendant-employer is merely a pretext for discrimination.  *Id*.

Park Pleasant's articulated reason for terminating Alston was that she failed to perform her essential job duties.  (Kane Dep. 13:19-14:4; 15:12-17; 37:18-38:14.)  Once Kane became Alston's supervisor, her attitude began to change.  (*Id*. at 32:11-23.)  The record evidence shows that from February through July, Alston failed to act professionally, perform assigned tasks, and admit patients in accordance with Park Pleasant's policies.  (ECF No. 16-3, Exhibits P and L; Kleinberg Dep. 108:18-111:22; Kane Dep. 30:3-31:16; 33:19-34:6; Alston Dep. 169:6-12.)  Park Pleasant gave Alston a Plan of Action–which she signed–that laid out expectations and areas for improvement if she was to continue working there.  (ECF No. 16-3, Exhibit P.)  A week later, when asked what her priorities were for the nursing department, Alston responded that she "needed to know what was expected of the nursing department from her." (Alston Dep. 394:19-395:5.)  Kleinberg felt that after a period of ongoing meetings, there was an evident lack of

cooperation that was no longer worth trying to remedy. (Kleinberg Dep. 101:7-25.) This evidence is sufficient for Park Pleasant to meet its "relatively light" burden of articulating a legitimate nondiscriminatory reason for Alston's termination.

The burden accordingly would shift back to Alston to demonstrate that Park Pleasant's proffered reason was pretextual. To meet this burden at summary judgment, Alston would have to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. She "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Park Pleasant's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Id.* at 765 (quotation omitted). She cannot merely assert that Park Pleasant's proffered reason was wrong; she must show that "it was so plainly wrong that it cannot have been [Park Pleasant's] real reason." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997).

Alston contends that Park Pleasant's assessment of her job performance is incorrect. In support, she relies heavily on her signed declarations discussed above. "Most often, a showing of pretext will require the production of documents or deposition testimony at odds with a defendant's proffered explanation." *Finizie v. Peake*, 548 F. Supp. 2d 171, 178 (E.D. Pa. 2008). "[I]t is the rare employment case in which a plaintiff can demonstrate pretext solely on the basis of her own affidavit." *Id.* Alston's declarations contend that she was doing a good job at work. (Pl.'s Decl., ECF No. 19, at ¶¶ 4-9.) She also states "with 100% certainty that Ms. Kane and Ms. Kleinberg were fully aware" of her medical condition. (*Id*. at ¶ 18.) As the Court noted above,

Alston cannot defeat summary judgment by simply submitting a set of sworn declarations, particularly when those declarations contradict her deposition testimony in material respects.  In any event, Alston's view of her job performance is irrelevant.  "[W]hat matters is the perception of the decision maker.  The fact that an employee disagrees with an employer's evaluation of [her] does not prove pretext."  *Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991).

Alston has failed to meet her burden of proving a *prima facie* case of disability discrimination by a preponderance of the evidence.  Even if she could, she fails to offer any evidence establishing that Park Pleasant's legitimate nondiscriminatory reason was pretextual.  Accordingly, Park Pleasant's motion for summary judgment is granted.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.